TRINA A. HIGGINS, United States Attorney (#7349)
TODD C. BOUTON, Assistant United States Attorney (#17800)
Attorneys for the United States of America
Office of the United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Telephone: (801) 524-5682
Email: todd.bouton@usdoj.gov

FILED U.S. District Court-UT
JUL 26 '23 PM01:46

FILED
2023 JUL 26 PM 1:46
CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. PETER N. SINJU, Defendant. | INDICTMENT<br><br>VIOLATIONS:<br><br>COUNTS 1-4: 18 U.S.C. § 1014, False Statement to a Bank<br><br>COUNT 5-9: 18 U.S.C. § 1343, Wire Fraud |

Case: 2:23-cr-00280
Assigned To : Nielson, Howard C., Jr
Assign. Date : 7/25/2023

The Grand Jury Charges:

I. **BACKGROUND**

At all times relevant to this Indictment:

1. Defendant PETER N. SINJU ("SINJU") was a resident of Salt Lake City, Utah in the District of Utah.

2. SINJU was a Certified Public Accountant ("CPA") working in Salt Lake City, Utah and a partner at Recon CPA, LLC.

3. During the COVID-19 pandemic, SINJU attempted to defraud COVID-19 relief programs in the name of some of his unknowing clients.

4. SINJU specifically devised a scheme to defraud the Paycheck Protection Program and the Economic Injury Disaster Loan program by submitting fraudulent,

exaggerated, and duplicative payroll and revenue information to lenders and the SBA on behalf of his unknowing clients to help them obtain loans they did not qualify for.

### SINJU's Relevant Clients

5. Company 1 was a framing company owned by Individual 1 and was a client of SINJU.

6. Company 2 was a food-truck business owned by Individual 2 and was a client of SINJU.

7. Company 3 was an import/export company owned by Individual 3 and was a client of SINJU.

8. Company 4 was a residential-concrete business owned by Individual 4 and was a client of SINJU.

9. Company 5 was a hair salon-type business owned by Individual 5 and was a client of SINJU.

### The Small Business Administration

10. The Small Business Administration ("SBA") is an executive branch agency of the United States government that provides support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

11. As part of this effort, the SBA enables and provides loans through banks, credit unions, and other lenders. These loans have government-backed guarantees.

### The Paycheck Protection Program

12. On March 27, 2020, the President signed into law the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). This Act was an economic stimulus bill that, among other things, provided emergency financial assistance to small business owners, including agricultural businesses, and nonprofit organizations in all U.S. states, Washington D.C., and territories which were affected by the COVID-19 pandemic. One

form of assistance provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").

13.     As discussed more fully below, the PPP program, which is operated by the SBA, provided small businesses with funding to meet specific business obligations, including payroll and rent. The PPP program permitted participating third-party lenders to approve and disburse SBA-backed PPP Loans to cover payroll, fixed debts, utilities, rent/mortgage, accounts payable, and other bills incurred by qualifying businesses during, and resulting from, the COVID-19 pandemic. PPP Loans are fully guaranteed by the SBA. In the event of default, SBA will fully satisfy the lender for any balance remaining on the loan. Further, SBA will forgive any loan up to 100 percent if the borrower establishes it utilized 60 percent of the loan on payroll costs in the 24-week period post-disbursement, with the remaining 40 percent going toward covered mortgage interest payments, covered rent payments, covered utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures. Whatever portion is not forgiven is serviced as a loan.

14.     The SBA promulgated regulations concerning eligibility for a PPP Loan. To obtain a PPP Loan, a qualifying business was required to submit a PPP-Loan application, which was signed by an authorized representative of the business. The PPP-Loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP Loan, including that the business was in operation on February 15, 2020 and either had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on a "Form 1099-MISC." Specifically, in the PPP-Loan application (SBA Form 2483), the small business (through its authorized representative) was required to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees.

3

15. In addition, a business applying for a PPP Loan was required to provide documentation showing its payroll expenses. This payroll information was material to the loan application because, pursuant to statutory requirements and implementing regulations, the amount of the loan that typically could be approved was a function of the applicant's historical payroll costs, consisting of compensation to its employees whose principal place of residence was the United States, subject to certain exclusions. Once approved for a PPP Loan by a participating third-party lender, small businesses could receive loans of up to $10,000,000.

16. Individuals who operated a business under a "sole proprietorship" business structure were also eligible for a PPP Loan. To qualify for such a PPP Loan, individuals had to report and document their income and expenses from the sole proprietorship, as typically reported to the Internal Revenue Service on a "Form 1040, Schedule C," for a given tax year. As with other PPP Loans, this information and supporting documentation was used to calculate the amount of money the individual was entitled to receive under the PPP program. The maximum loan amount for a sole proprietor with no employees was $20,833.

17. By signing a PPP-Loan application, each applicant attested that the information provided in the application and in all supporting documents and forms was true and accurate, and that the applicant understood that knowingly making a false statement to obtain a PPP Loan was a crime.

### PPP-Loan Application Processing Through Server in Virginia

18. A PPP-Loan application was processed by the third-party participating lender with whom the application was filed. If a PPP-Loan application was approved, the participating lender would fund the PPP Loan; in order to encourage PPP Loans to be issued, the loan was guaranteed by the SBA. Data from the application, including information from the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

19. More specifically, up until August 8, 2020, during the first two rounds of PPP Loans, PPP-Loan applications were received through the SBA E-Tran server which is located in Sterling, Virginia. After PPP lenders disbursed the PPP-Loan funds to the borrower, PPP lenders submitted disbursement details into the SBA E-Tran system located in Sterling, Virginia. The SBA then transmitted the PPP processing fee to the lender through the Financial Management System ("FMS") to the Treasury. The primary server for the FMS is also in Sterling, Virginia.

### Authorized Use of PPP-Loan Funds and Forgiveness of PPP Loans

20. The proceeds of a PPP Loan could be used only for certain specified items, such as payroll costs, costs related to the continuation of group health care benefits, or mortgage interest payments. The proceeds of a PPP loan were not permitted to be used by the borrowers to purchase consumer goods, automobiles, personal residences, clothing, jewelry, to pay the borrower's personal federal income taxes, or to fund the borrower's ordinary day-to-day living expenses unrelated to the specified authorized expenses.

21. If a borrower used PPP-Loan funds for authorized expenses, the borrower could later apply for forgiveness of all the loan proceeds properly executed.

### The EIDL Loan Program

22. Another related response to the COVID-19 outbreak was an expansion of an existing disaster-related program called the Economic Injury Disaster Loan ("EIDL Loan"). EIDL Loans provided for loan assistance (including $10,000 advances) for small businesses and other eligible entities for loans up to certain amounts.

23. In order to obtain an EIDL Loan and advance, a qualifying business was required to submit an application to the SBA and provide information about its operations, such as its number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDL Loans for COVID-19 relief, the 12-month period was the period preceding January 31, 2020. For a business to be eligible for an EIDL Loan, the business must have

5

been in operation before February 1, 2020. The applicant was also required to certify that all of the information in the application was true and correct to the best of the applicant's knowledge.

24. In the required Loan Authorization and Agreement related to each loan application, applicants were also required to agree to use the EIDL Loan funds solely as working capital to alleviate economic injury caused by the COVID-19 disaster.

25. In their applications and related loan agreements, applicants were warned that any false statement or misrepresentation to the SBA, or any misapplication of loan proceeds might result in sanctions, including criminal penalties.

26. Unlike funds from other types of SBA-guaranteed loans, such as PPP Loans, EIDL-Loan funds were issued directly from the United States Treasury, and applicants applied for EIDL-Loan funds directly through the SBA via an online portal and application. All EIDL-Loan applications were thus submitted online.

### EIDL-Loan Application Processing Through Interstate Servers

27. Prior to July 11, 2020, EIDL-Loan applications were submitted through the SBA's Office of Disaster Assistance Disaster Credit Management System 2.0. During this time period, all EIDL-Loan applications with a prefix of 33 were processed through a server located in West Des Moines, Iowa.

28. The approval of both the EIDL-Loan application and the amount of the related EIDL loan was based, in part, on the information provided in the EIDL-Loan application about the applicant's number of employees, gross revenue, and cost of goods, as described above. The SBA required minimal documentation and information from small businesses to support the information asserted in an EIDL-Loan application before the SBA would process the EIDL-Loan application for approval.

29. Once an SBA EIDL-Loan application was approved, the SBA's Denver Finance Center, located in Denver, Colorado, created payment files and authorized payments of the EIDL-Loan funds based on those applications. For disbursement, EIDL-

Loan funds were first transmitted by the Financial Management System ("FMS") to the Treasury, and then to the loan recipient's bank account. The primary server for the FMS is in Sterling, VA. Upon approval of an application for an EIDL Loan or advance, the SBA would disburse the funds.

### Authorized Use of EIDL-Loan Funds

30. EIDL-Loan proceeds were permitted to be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments. However, such loan proceeds were not intended to replace lost sales or profits, or to be used to expand the applicant business.

### Financial Institution and PPP-Loan Lender

31. First Utah Bank was and is a financial institution, the deposits of which are federally insured by the Federal Deposit Insurance Corporation. While the PPP-Loan program was in operation, First Utah Bank offered PPP Loans to applicants.

### II. THE SCHEME AND ARTIFICE TO DEFRAUD

32. Beginning on or around June 2, 2020, and continuing to and including on or around July 3, 2020, within the District of Utah and elsewhere, the defendant,

### PETER N. SINJU,

knowingly devised and executed a scheme and artifice to defraud and sought to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and omissions of material facts.

33. In executing and attempting to execute the scheme and artifice to defraud, and in furtherance thereof, SINJU:

    a. Knowingly made false statements and caused false statements to be made to a financial institution, in violation of 18 U.S.C. §1014 (False Statements to a Bank) by, *inter alia*, submitting at least four PPP-Loan applications to First Utah Bank between approximately June 5, 2020 and June 15, 2020; and

7

b. Knowingly devised and intended to devise a scheme and artifice to defraud the SBA and made false and fraudulent pretenses, representations, and promises to the SBA, in violation of 18 U.S.C. § 1343 (Wire Fraud) by, *inter alia*, submitting or causing to be submitted at least five fraudulent EIDL-Loan applications between approximately June 2, 2020 and July 3, 2020.

### III. THE OBJECT OF THE SCHEME AND ARTIFICE TO DEFRAUD

34. It was the object of the scheme and artifice to defraud for SINJU to obtain money for his unknowing clients from First Utah Bank and the SBA in the form of PPP-Loan and EIDL-Loan proceeds through false statements, misrepresentation, deception, and omissions of material facts, and to then take a portion of those loan proceeds as a fee or commission for obtaining the loans for his clients.

### IV. MANNER AND MEANS OF THE SCHEME AND ARTIFICE TO DEFRAUD

*Company 1's EIDL-Loan Application:*

35. On or about June 2, 2020, on behalf of Company 1, defendant SINJU completed and submitted an application to the SBA for an EIDL Loan in the amount of $79,297.50.

36. In execution and furtherance of the scheme and artifice to defraud, defendant SINJU made, or caused to be made, the following false and fraudulent representation to the SBA:

a. In 2019, Company 1's gross revenues were $324,006, when in fact, the company's gross revenues were only approximately $250,000.

*Company 1's PPP-Loan Application:*

37. On or about June 5, 2020, on behalf of Company 1, defendant SINJU completed and submitted an application to First Utah Bank for a PPP Loan in the amount of $41,700.

38. In execution and furtherance of the scheme and artifice to defraud, defendant SINJU made, or caused to be made, one or more of the following false and fraudulent representations to First Utah Bank:

    a. The payroll summary submitted in support of the PPP-Loan application ("Company 1's Payroll Summary") was true and accurate, when in fact, it was not;

    b. The employees listed in Company 1's Payroll Summary were all Company 1 employees, when in fact, some of them were not actually Company 1 employees; and

    c. The Company 1 employees listed on Company 1's Payroll Summary were paid a total of $203,469.97 in 2019, when in fact, Company 1's employees were not paid more than a total of approximately $56,000.

39. On or around June 8, 2020, First Utah Bank approved and funded a PPP Loan to Company 1 in the amount of $41,000.

***Company 2's EIDL-Loan Application:***

40. On or about June 9, 2020, on behalf of Company 2, defendant SINJU completed and submitted an application to the SBA for an EIDL Loan in the amount of $50,600.

41. In execution and furtherance of the scheme and artifice to defraud, defendant SINJU made, or caused to be made, the following false and fraudulent representation to the SBA:

    a. In 2019, Company 2 had $123,369 in gross revenues, when in fact, this number overstated the company's revenues, which were closer to approximately $50,000.

42. In response to the EIDL-Loan application, on or about July 1, 2020, Company 2 received $50,600 in EIDL-Loan proceeds.

9

*Company 2's PPP-Loan Application:*

43. On or about June 11, 2020, on behalf of Company 2, defendant SINJU completed and submitted an application to First Utah Bank for a PPP Loan in the amount of $20,800.

44. In execution and furtherance of the scheme and artifice to defraud, defendant SINJU made, or caused to be made, the following false and fraudulent representation to First Utah Bank:

    a. An IRS Form Schedule C for 2019 accurately showed that Company 2 had gross revenues of $123,369 in 2019, when in fact, the company's 2019 gross revenues were closer to approximately $50,000.

*Company 3's EIDL-Loan Application:*

45. On or about June 9, 2020, on behalf of Company 3, defendant SINJU completed and submitted an application to the SBA for an EIDL Loan in the amount of $81,000.

46. In execution and furtherance of the scheme and artifice to defraud, defendant SINJU made, or caused to be made, the following false and fraudulent representation to the SBA:

    a. In 2019, Company 3 had gross revenues of $221,526, when in fact, the company had gross revenues of only $20,000 to $30,000.

47. On or about June 21, 2020, Company 3's owner received $81,000 in EIDL-Loan proceeds.

*Company 3's PPP-Loan Application:*

48. On or about June 15, 2020, on behalf of Company 3, defendant SINJU completed and submitted an application to First Utah Bank for a PPP Loan in the amount of $36,100.

49. In execution and furtherance of the scheme and artifice to defraud, defendant SINJU made, or caused to be made, one or more of the following false and fraudulent representations to First Utah Bank:

   a. Company 3 had a monthly payroll of $14,441, when in fact, it did not;
   b. Company 3 had 5 employees, when in fact, it never had any employees other than its owner, Individual 3;
   c. Company 3 was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes, when in fact, it only had 1 employee—its owner, Individual 3;
   d. The payroll summary submitted with Company 3's PPP-Loan application ("Company 3's Payroll Summary") was true and accurate, when in fact, it was not;
   e. As reflected in Company 3's Payroll Summary, in 2019, Company 3 had paid employee wages totaling $146,177.77, when in fact, it had not;
   f. As reflected in Company 3's Payroll Summary, in 2019, Company 3 had employed 5 specific employees, when, in fact, the company had never employed any of those employees;
   g. As reflected in the IRS Forms 940 and 941 submitted in support of Company 3's PPP-Loan application, in 2019, Company 3 had paid a total of $146,177.77 in employee wages, when in fact, Company 3 had no other employees other than its owner, Individual 3, and made only $20,000 to $30,00 in revenues; and
   h. As reflected in an IRS Form 941 submitted in support of Company 3's PPP-Loan Application, from January to March 2020, Company 3 had 4 employees and paid them $38,369, when in fact, none of this was true.

*Company 4's EIDL-Loan Application:*

50. On or about June 10, 2020, on behalf of Company 4, defendant SINJU completed and submitted an application to the SBA for an EIDL Loan in the amount of $48,000.

51. In execution and furtherance of the scheme and artifice to defraud, defendant SINJU made, or caused to be made, the following false and fraudulent representation to the SBA:

    a. In 2019, Company 4 had $258,963 in gross revenues, when in fact, Company 4 only had $3,000 in gross revenues.

52. In response to the EIDL-Loan application, on or about June 24, 2020, Company 4 received $48,000 in EIDL-Loan proceeds.

*Company 4's PPP-Loan Application:*

53. On or about June 15, 2020, on behalf of Company 4, defendant SINJU completed and submitted an application to First Utah Bank for a PPP Loan in the amount of $36,400.

54. In execution and furtherance of the scheme and artifice to defraud, defendant SINJU made, or caused to be made, one or more of the following false and fraudulent representations to First Utah Bank:

    a. Company 4 had an average monthly payroll of $14,632.25, when in fact, the actual amount was $0;

    b. Company 4 had 8 employees, when in fact, it only had 1 (its owner, Individual 4);

    c. Company 4 was in operation on February 15, 2020, when in fact, it had not conducted any business in 2020 and had no employees;

    d. Company 4 had employees for whom it paid salaries and payroll, when in fact, it only had 1 employee—its owner, Individual 4;

e. The payroll summary submitted in support of Company 4's PPP-Loan application ("Company 4's Payroll Summary") was true and accurate, when in fact, it was not;

f. As reflected in Company 4's Payroll Summary, in 2019, Company 4 had paid total wages of $175,381.75, when in fact, Company 4 had only completed one job in 2019 for $3,000 and had not paid such wages;

g. As reflected in Company 4's Payroll Summary, in 2019, employee M.W. had been paid $30,168.76 in wages, when in fact, he had only worked for Company 4 a single week and was not paid that amount in wages; and

h. As reflected in the IRS Form 940 and 941s submitted in support of Company 4's PPP-Loan application, in 2019, Company 4 had paid $175,587 in salaries to employees, when in fact, it had not.

***Company 5's EIDL-Loan Application:***

55. On or about July 3, 2020, on behalf of Company 5, defendant SINJU completed and submitted an application to the SBA for an EIDL Loan in the amount of $67,200.

56. In execution and furtherance of the scheme and artifice to defraud, defendant SINJU made, or caused to be made, the following false and fraudulent representation to the SBA:

a. In 2019, Company 5 had gross receipts (revenues) of $168,362, when in fact, the company's revenues did not exceed $14,000.

57. All of the above-referenced EIDL-Loan applications which were submitted on behalf of Company 1, Company 2, Company 3, Company 4, and Company 5 were submitted through a server located in West Des Moines, Iowa.

/ / /

/ / /

## COUNTS 1-4
18 U.S.C. § 1014)
(False Statement to a Bank)

58. The allegations set forth above are incorporated herein by reference and realleged as though fully set forth in these Counts.

59. Beginning around June 5, 2020 and continuing in and through at least June 15, 2020, in the District of Utah and elsewhere, the defendant,

**PETER N. SINJU,**

knowingly made, and caused to be made, false statements listed above for the purpose of influencing the action of First Utah Bank, a bank the deposits of which were insured by the Federal Deposit Insurance Corporation, in connection with four separate PPP-Loan applications for a total of approximately $135,000, in that defendant SINJU made and caused to be made false statements in the following PPP-Loan applications:

| COUNT | DATE (on or about) | PPP-LOAN APPLICATIONS WITH FALSE STATEMENTS IN THEM |
|---|---|---|
| 1 | 6/5/20 | PPP-Loan Application No. -7800 submitted to First Utah Bank on behalf of Company 1 (for approximately $41,700). |
| 2 | 6/11/20 | PPP-Loan Application (Number not assigned) submitted to First Utah Bank on behalf of Company 2 (for approximately $20,800). |
| 3 | 6/15/20 | PPP-Loan Application No. -7027 submitted to First Utah Bank on behalf of Company 3 (for approximately $36,100) |
| 4 | 6/15/20 | PPP-Loan Application No. (Not Assigned) submitted to First Utah Bank on behalf of Company 4 (for approximately $36,400) |

All in violation of 18 U.S.C. § 1014.

///

///

///

## COUNTS 5-9
18 U.S.C. § 1343)
(Wire Fraud)

60. The allegations set forth above are incorporated herein by reference and realleged as though fully set forth in these Counts.

61. Beginning around June 2, 2020 and continuing in and through at least July 3, 2020, in the District of Utah and elsewhere, the defendant,

**PETER N. SINJU,**

having devised and intended to devise a scheme and artifice to defraud, and for obtaining money and property from the SBA, by means of false and fraudulent pretenses, representations, promises, and omissions of material facts, for the purpose of executing said scheme and artifice to defraud, caused the following representative items to be transmitted by means of wire communication in interstate commerce described below for each count, each transmission constituting a separate count:

| COUNT | DATE (on or about) | INTERSTATE WIRE COMMUNICATIONS |
|---|---|---|
| 5 | 6/2/20 | Purportedly on behalf of a Utah business (Company 1), SINJU caused to be submitted EIDL-Loan Application No. 33xxxx2407 (for an approximately $79,297.50 EIDL Loan) through a server located in West Des Moines, Iowa. |
| 6 | 6/9/20 | Purportedly on behalf of a Utah business (Company 2), SINJU caused to be submitted EIDL-Loan Application No. 33xxxx5357 (for an approximately $50,600 EIDL Loan) through a server located in West Des Moines, Iowa. The EIDL-Loan payment for this loan was then initiated and processed through servers in Colorado and Virginia. |
| 7 | 6/9/20 | Purportedly on behalf of a Utah business (Company 3), SINJU caused to be submitted EIDL-Loan Application No. 33xxxx6260 (for an approximately $81,000 EIDL Loan) through a server located in West Des Moines, Iowa. The EIDL-Loan payment for this loan was then initiated and processed through servers in Colorado and Virginia. |

15

| 8 | 6/10/20 | Purportedly on behalf of a Utah business (Company 4), SINJU caused to be submitted EIDL-Loan Application No. 33xxxx8124 (for an approximately $48,000 EIDL Loan) through a server located in West Des Moines, Iowa. The EIDL-Loan payment for this loan was then initiated and processed through servers in Colorado and Virginia. |
| 9 | 7/3/20 | Purportedly on behalf of a Utah business (Company 5), SINJU caused to be submitted EIDL-Loan Application No. 33xxxx6373 (for an approximately $67,200 EIDL Loan) through a server located in West Des Moines, Iowa. |

All in violation of 18 U.S.C. § 1343.

## NOTICE OF INTENT TO SEEK FORFEITURE

Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), upon conviction of any offense violating 18 U.S.C. § 1014, the defendant(s) shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from proceeds traceable to the scheme to defraud. The property to be forfeited includes, but is not limited to:

- A money judgment equal to the value of any property not available for forfeiture as a result of any act or omission of the defendant(s) for one or more of the reasons listed in 21 U.S.C. § 853(p).

- Substitute property as allowed by 28 U.S.C. § 2461(c) and 21 U.S.C. § 853(p).

Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), upon conviction of any offense violating 18 U.S.C. § 1343, the defendant(s) shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from proceeds traceable to the scheme to defraud. The property to be forfeited includes, but is not limited to:

- A money judgment equal to the value of any property not available for forfeiture as a result of any act or omission of the defendant(s) for one or more of the reasons listed in 21 U.S.C. § 853(p).

- Substitute property as allowed by 28 U.S.C. § 2461(c) and 21 U.S.C. § 853(p).

A TRUE BILL:

/s/
FOREPERSON OF GRAND JURY

TRINA A. HIGGINS
United States Attorney


TODD C. BOUTON
Assistant United States Attorney